Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/14/2020 09:07 AM CDT

Jennifer E. Bornhorst, appellant and cross-appellee,
v. Matthew D. Bornhorst, appellee
and cross-appellant.
___ N.W.2d ___

Filed April 14, 2020.    No. A-18-903.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion.

2. **Visitation: Appeal and Error.** Parenting time determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion.

3. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

4. **Evidence: Appeal and Error.** When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

5. **Child Custody.** When deciding custody issues, the court's paramount concern is the child's best interests.

6. ____. In determining the best interests of a child in a custody determination, a court must consider pertinent factors, such as the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and

parental capacity to provide physical care and satisfy educational needs of the child.

7. ____. A trial court's decision to award joint legal or physical custody can be made without parental agreement or consent so long as it is in the child's best interests.

8. **Divorce: Property Division.** The active appreciation rule sets forth the relevant test to determine to what extent marital efforts caused any part of the appreciation or income.

9. **Divorce: Property Division: Words and Phrases.** Appreciation caused by marital contributions is known as active appreciation, and it constitutes marital property.

10. ____: ____: ____. Passive appreciation is appreciation caused by separate contributions and nonmarital forces.

11. **Divorce: Property Division: Presumptions.** Accrued investment earnings or appreciation of nonmarital assets during the marriage are presumed marital unless the party seeking the classification of the growth as nonmarital proves: (1) The growth is readily identifiable and traceable to the nonmarital portion of the account and (2) the growth is not due to the active efforts of either spouse.

12. **Divorce: Property Division: Proof.** The burden is on the owning spouse to prove the extent to which marital contributions did not cause the appreciation or income.

13. **Corporations: Employer and Employee.** Despite the importance of each employee in a company, a company's value for purposes of active appreciation is attributable only to the efforts of first-tier management or similar persons with control over the asset's value.

14. ____: ____. Courts have uniformly rejected arguments by the owning spouse that the universe of persons in a company that effect its value is so large that no one person has any significant effect.

15. **Child Support: Rules of the Supreme Court.** The Nebraska Child Support Guidelines provide that in calculating the amount of child support to be paid, the court must consider the total monthly income, which is defined as income of both parties derived from all sources, except all means-tested public assistance benefits which includes any earned income tax credit and payments received for children of prior marriages and includes income that could be acquired by the parties through reasonable efforts.

16. **Modification of Decree: Child Support.** The paramount concern in child support cases, whether in the original proceeding or subsequent modification, remains the best interests of the child.

17. **Child Support: Corporations: Taxes: Evidence: Proof.** Distributions made to a shareholder of a subchapter S corporation, as reported on a schedule K-1, should not be included as income for purposes of

calculating child support for those portions of the distribution intended to offset the shareholder's personal tax liability on his or her proportionate share of the S corporation's pass-through earnings. However, if the evidence establishes that the total distribution exceeds the shareholder's tax liability on his or her proportionate share of the S corporation's pass-through earnings, such excess portions of the distribution may be included as income for child support purposes unless the evidence demonstrates that such excess amounts are reasonably expected to be applied to future tax liabilities.

Appeal from the District Court for Washington County: Paul J. Vaughan, Judge. Affirmed.

Shane J. Placek, of Sidner Law, for appellant.

Philip B. Katz and Steven J. Riekes, of Marks, Clare & Richards, L.L.C., for appellee.

Moore, Chief Judge, and Pirtle and Bishop, Judges.

Bishop, Judge.

## I. INTRODUCTION

In this dissolution action, the Washington County District Court awarded Jennifer E. Bornhorst and Matthew D. Bornhorst joint legal and physical custody of their children. Jennifer was ordered to pay child support. The district court also found that Jennifer's nonmarital stock in her family's subchapter S corporation increased in value during the marriage and that the increase was therefore a marital asset for purposes of dividing the marital estate.

Jennifer appeals, challenging the district court's decision to award joint legal and physical custody and its determination that the growth in value of her nonmarital stock was a marital asset. Matthew cross-appeals, challenging the district court's decision to not include as income for child support purposes the distributions Jennifer received from her family's business, which Jennifer claimed were intended only to offset her personal tax liability on her share of the S corporation's pass-through income. We affirm.

## II. BACKGROUND

Jennifer and Matthew were married in 2010, and they have two children, one born in 2013 and the other born in 2014. The parties separated in December 2016.

Jennifer filed for divorce in February 2017. She originally asked that the parties be awarded joint legal custody of their two children, but that she be awarded physical custody. However, in her amended complaint, she asked the district court to award the legal and physical custody of the children to her, subject to Matthew's reasonable rights of parenting time, but "[i]n the event full custody" was not awarded to her, Jennifer asked the court to award the parties joint legal and physical custody. Matthew's responsive pleading and counterclaim requested joint legal and physical custody.

Both parties filed motions for temporary relief, and the district court entered a temporary order on June 29, 2017, awarding the parties joint legal custody of the children, but awarding "primary physical care" to Jennifer. The temporary order awarded Matthew parenting time every other weekend from Friday at 5 p.m. until Monday at 8 a.m., and every week on Wednesday at 5 p.m. until Thursday at 8 a.m.; a holiday schedule was also included. Pursuant to the temporary order, Matthew was to pay $974 per month to Jennifer for child support, commencing July 1.

On October 27, 2017, Jennifer filed a motion for further temporary allowances, asking the district court for an order modifying the previous temporary order to provide for "'joint legal custody with tie-breaking authority to [Jennifer].'" She also asked for an order authorizing her to enroll the children in activities, childcare, and schooling in Blair, Nebraska. In an order filed on November 29, the court denied Jennifer's request "for the tiebreaker in relation to joint legal custody," granted her request to change the children's childcare and schooling to Blair, and ordered that "each party is free to enroll the children in activities and participate in same during

their respective parenting time without the permission of the other party."

Trial took place on April 19 and 20, 2018. We will discuss the trial evidence relevant to the errors assigned in our analysis below. A decree dissolving the marriage was entered by the district court on July 11 and amended on July 16 and August 28.

Relevant to this appeal, the district court awarded the parties joint legal and physical custody of their two minor children and adopted a 50-50 parenting time schedule. The court ordered Jennifer to pay Matthew child support in the amount of $283 per month for two children. When determining income for child support purposes, the district court did not include Jennifer's schedule K-1 (K-1) distribution related to her 8.30565-percent ownership interest in her family's company (Eriksen Construction), because it found the income was speculative and Jennifer had no control over the timing or amount of the distributions.

With regard to the parties' property, the district court awarded Jennifer the entirety of her stock and ownership interest in Eriksen Construction as her separate property. However, the court found that Jennifer's nonmarital stock grew in value in an amount "at least equivalent to the total retained earnings" and that the growth in value was a marital asset for purposes of dividing the marital estate. After valuing and dividing the marital assets and debts, the court ordered Matthew to pay Jennifer an equalization payment of $79,348, which included a reimbursement to Jennifer of her $50,000 premarital contribution toward the purchase of the marital residence which was awarded to Matthew.

On July 19, 2018, Jennifer filed a motion for new trial or, in the alternative, to alter or amend. After a hearing on the motion, the district court entered an order on August 28 granting Jennifer's motion in part; the court amended the parenting plan to provide that Jennifer would have "tiebreaking authority" for nonemergency medical issues regarding the children

"as [Matthew] had consented to that during his testimony at trial." All other requested relief was denied.

Jennifer appeals and Matthew cross-appeals from the marriage dissolution decree, as amended by the district court.

## III. ASSIGNMENTS OF ERROR

Jennifer assigns, summarized and reordered, that the district court abused its discretion by (1) allowing certain expert testimony, (2) awarding joint legal and physical custody, and (3) applying the active appreciation rule in determining that the retained earnings of Jennifer's gifted nonmarital asset were part of the marital estate and should be equitably divided.

On cross-appeal, Matthew claims the district court abused its discretion by not including the distributions received by Jennifer from Eriksen Construction for purposes of determining her child support obligation.

## IV. STANDARD OF REVIEW

[1] In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017).

[2] Parenting time determinations are also matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Aguilar v. Schulte*, 22 Neb. App. 80, 848 N.W.2d 644 (2014), *disapproved on other grounds, State on behalf of Kaaden S. v. Jeffrey T.*, 303 Neb. 933, 932 N.W.2d 692 (2019).

[3] An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015).

[4] When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Donald v. Donald, supra*.

## V. ANALYSIS

### 1. Jennifer's Appeal

#### (a) Expert Witness Testimony

Jennifer contends the district court erred in allowing Matthew's expert witness, Dr. Glenda Cottam, to provide testimony about a custody evaluation when she was court ordered to perform a parenting assessment only. Jennifer also argues the court erred in allowing Dr. Cottam to refer to published articles and in allowing another of Matthew's expert witnesses, a certified public accountant, to provide his opinion and interpretation of Nebraska case law on retained earnings. However, to the extent either witness testified to matters which may have been inappropriate or otherwise inadmissible, we note that in all cases, the district court, as the trier of fact in a bench trial, is presumed to have considered only the appropriate evidence. See, e.g., *Tapia-Reyes v. Excel Corp.*, 281 Neb. 15, 793 N.W.2d 319 (2011) (it is presumed that judges disregard evidence which should not have been admitted); *In re Interest of Ty M. & Devon M.*, 265 Neb. 150, 655 N.W.2d 672 (2003) (absent showing to contrary, it is presumed that trial court disregarded all incompetent and irrelevant evidence).

#### (b) Custody

Jennifer argues the district court's award of joint legal and physical custody was contrary to the evidence.

##### (i) Evidence at Trial

Jennifer testified that at the time of the parties' separation in December 2016, they had been living in their marital residence in Bennington, Nebraska. In December, Jennifer moved into

her father's house in Blair, and then in April 2017, she moved into a rental property in Blair. She had plans to purchase a home in a particular subdivision in Blair after the divorce, because "a lot of [her] equity that [she] would need to purchase a home [was] tied up" in the marital residence. Matthew agreed that the children would attend school in Blair and that their activities would be in Blair. Jennifer had a "huge support network" with her family and friends in Blair; Matthew's parents lived in Iowa, about 2 hours away, and his siblings lived out of state.

According to Jennifer, from the time of the parties' separation in December 2016 until the time of the temporary order in June 2017, they had a "kind of confusing" parenting schedule. Jennifer said she "was getting a lot of issues from the girls with being angry, being upset, clinginess, and the biggest issue was when we had that extended five-day period every other week that they were away from me." The younger child was having nightmares, and the older child was crying a lot. Matthew testified that he did not experience those same things when the children were with him. According to Jennifer, communication between her and Matthew was not going very well—they would email and text, but were not talking on the telephone much because "there was a lot of anger and aggression happening."

Jennifer and Matthew testified that at the time of trial, Jennifer's communication with Matthew was by "email only." Jennifer received an email from Matthew one day stating that going forward communication was to happen via email only, and he set up a new email account. Matthew informed her that she was not allowed to text or call unless it was an emergency. However, Jennifer stated that Matthew's email was "not linked to his phone" and that Matthew told her he did not check this email as often. Jennifer's testimony about the new communication protocol was corroborated by emails received into evidence; particularly emails from early February 2018. Matthew testified that the separate email communication

method was suggested by Dr. Cottam and his individual thera-
pist; he acknowledged that he did not explain that to Jennifer.
Jennifer said that if she communicated with Matthew through
some form other than email, she would not get a response
or would "get an angered email back." Since the separation,
Jennifer and Matthew "haven't agreed on anything[,] even as
small as me taking the girls to swimming lessons on a night
I have them, we had to bring that to the Court." Jennifer did
not believe that she and Matthew communicated effectively
enough to exercise joint legal custody. However, she later
acknowledged that she was willing to continue to do joint
legal custody, but was asking for a "tiebreaker" where she
would have the final say; this legal custody arrangement
was also reflected in her proposed parenting plan which was
received into evidence.

Matthew testified that as of the time of trial, there was no
disagreement between him and Jennifer regarding the chil-
dren's religion, daycare, schooling, or location of activities.
During the marriage, he and Jennifer were able to make medi-
cal decisions together, but there were disagreements once they
decided to get a divorce. He believed they would be able to
coparent going forward. If the parties were awarded joint legal
custody, Matthew "would be agreeable" to giving Jennifer final
decisionmaking authority on medical decisions if the parties
reached an impasse after discussion.

Jennifer was seeking physical custody of the children, con-
sistent with the temporary order that had been in place since
June 2017. Jennifer testified that during the marriage, she did all
of the paperwork and communication for their younger child's
adoption, she set up all of the "well-check appointments" for
the children and would take them to those appointments, and
she would usually take them to "sick appointments." Matthew
attended only a few appointments.

According to Jennifer, the girls have missed various activi-
ties during Matthew's parenting time. During the fall of 2017,
the girls missed three out of eight soccer games. Matthew

brought them to only one game during his parenting time; they missed the other three games during his parenting time because of "scheduling conflicts" even though the schedule was sent out "well in advance." Matthew testified that he "immediately" agreed that the girls could play soccer, but also told Jennifer that they had plans for the fall schedule, so as long as the games did not interfere with plans, they would attend. Matthew's testimony was corroborated by emails received into evidence. According to Jennifer, the girls have also missed numerous friends' birthday parties during Matthew's parenting time. Matthew acknowledged that the girls have missed some birthday parties during his parenting time because there were conflicts with scheduled plans.

According to Jennifer, the girls have witnessed Matthew yelling at her. For example, in February 2017, "[w]e had just flown back from Florida from visiting my parents and Matt got off the escalator and started approaching me, yelling, and saying, 'You've been F'ing lying to me for F'ing months. You've been F'ing plotting against me.'" Jennifer said that "both girls instantly just kind of went behind me and grabbed my legs, and I think all three of us were caught off guard." Matthew said he "won't deny" that there was an incident, but said "[i]t's been overexaggerated." It was the week after Jennifer delivered the divorce paperwork. He said, "I walked up to her, the girls were not hiding behind her. I did not publicly yell at her. We had a conversation about things. I did use some foul language in that conversation." He said he regrets his "choice of words" and would have liked to have handled it differently.

Jennifer has also witnessed Matthew treat the girls with aggression. In March 2017, Jennifer was sorting clothes in a room at Matthew's house (he and the girls were in another room), when Jennifer heard screaming and crying. She testified that "[our older child] comes in, screaming to me 'Daddy hurt me. Daddy hurt me,'" and that she had "his handprint on her arm and she's screaming so hysterically she's shaking."

Jennifer said that Matthew then came in the room yelling, "'You've been with your mom long enough. God blank. It's time to be with me.'" Jennifer said she spent about 45 minutes calming the child down. Matthew testified that the child wiggled out of his arms when he was carrying her downstairs for lunch and that she was crying at that point when she went in and saw Jennifer. Jennifer did not think Matthew was as "emotionally supportive" as she thought he should be for the girls. Matthew was "short" with them and told them they needed to "grow up," despite their young age. Jennifer thought she was "more patient" with the girls. Matthew acknowledged that both parties have been frustrated with the children from time to time.

Matthew was seeking 50-50 parenting time, with a "traditional 5-2-2-[5] schedule," but was open as to how parenting time would be structured. However, Matthew "would like to maintain as much routine structure" for the children as possible. Matthew believed both parties "[c]ertainly" have different parenting styles. He described Jennifer as "very nurturing . . . and supportive, and a loving mother." He described himself as "much more ridged," but said that he "provides the girls more structure." Matthew believed he also has nurturing and loving qualities with his children; they like to play games and go to the children's museum or the zoo and they have nicknames for each other. Their parenting styles "complimented each other" during the marriage. He acknowledged that each of them assumed different aspects of parenting during the marriage, but said that they were "equal parents" and shared in the raising of their children.

Numerous other witnesses, including friends and family, testified regarding the parties' parenting of their children. The witnesses generally described Jennifer as patient and loving, whereas they described Matthew as a little more short-tempered. However, the witnesses generally stated that both parties loved their children.

Dr. Cottam is a licensed clinical psychologist, has a law degree, and is also a mediator. Dr. Cottam stated that Jennifer and Matthew "are good individuals" and that "[t]hey have delightful children." When Dr. Cottam was behind an observation mirror, she observed each parent with the children for 1 hour; she observed both to have "excellent parenting skills." The children "were bonded, relaxed, [and] comfortable" with both Jennifer and Matthew. There is "no evidence of actual domestic violence, of CPS involvement, anything like that." She said, "Ideally, this should be a situation where the children have the benefit of having as much time as possible with each parent." Although both parties reported communication problems to her, Dr. Cottam believed that after the "court stuff goes away" "life is going to get better" for the parties and their communications and interactions will improve.

### (ii) District Court's Ruling

The district court awarded the parties joint legal and physical custody of the children. Jennifer was awarded "tiebreaking authority" for nonemergency medical issues regarding the children "as [Matthew] had consented to that during his testimony at trial." The court accepted and adopted Matthew's proposed 50-50 parenting plan, which was attached to the decree and incorporated therein. The parenting plan established "routine parenting time" on a "5-2/2-5 schedule," awarding parenting time to Matthew every Monday and Tuesday and to Jennifer every Wednesday and Thursday, with the weekend parenting time alternating between them. Also, each parent was awarded 2 weeks of "vacation parenting time" each year, which was to "only be taken as two (2) separate one-week periods of seven (7) consecutive days." A holiday parenting time schedule was also established.

### (iii) Applicable Law

[5,6] Keeping the evidence and the district court's findings in mind, we now consider the legal principles governing

custody and parenting time matters. When deciding custody issues, the court's paramount concern is the child's best interests. *Kashyap v. Kashyap*, 26 Neb. App. 511, 921 N.W.2d 835 (2018). Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) states, in pertinent part:

> In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:
>
> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
>
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;
>
> (c) The general health, welfare, and social behavior of the minor child;
>
> (d) Credible evidence of abuse inflicted on any family or household member. . . . ; and
>
> (e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Kashyap v. Kashyap, supra*.

[7] The Parenting Act defines "[j]oint legal custody" as "mutual authority and responsibility of the parents for making mutual fundamental decisions regarding the child's welfare, including choices regarding education and health." Neb. Rev. Stat. § 43-2922(11) (Reissue 2016). Courts typically do not

award joint legal custody when the parties are unable to communicate effectively. See, *Kamal v. Imroz*, 277 Neb. 116, 759 N.W.2d 914 (2009) (joint decisionmaking by parents not in child's best interests when parents are unable to communicate face-to-face and there is level of distrust); *Klimek v. Klimek*, 18 Neb. App. 82, 775 N.W.2d 444 (2009) (no abuse of discretion by district court's failure to award joint custody when minor child was confused by temporary joint legal and physical custody arrangement and parents had hard time communicating with one another). However, a trial court's decision to award joint legal or physical custody can be made without parental agreement or consent so long as it is in the child's best interests. See Neb. Rev. Stat. § 42-364(3)(b) (Cum. Supp. 2018). See, also, *Leners v. Leners*, 302 Neb. 904, 925 N.W.2d 704 (2019), *disapproved on other grounds, State on behalf of Kaaden S. v. Jeffrey T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). And appellate courts have in some instances declined to reverse trial court decisions where joint custody has been awarded or maintained even when the evidence demonstrates a lack of communication or cooperation between parents. See, *State on behalf of Jakai C. v. Tiffany M.*, 292 Neb. 68, 871 N.W.2d 230 (2015) (Nebraska Supreme Court affirmed district court's denial of father's request to modify custody of child from joint legal custody—mother with physical custody—to sole legal and physical custody despite apparent inability of parties to parent cooperatively with one another); *Kay v. Ludwig*, 12 Neb. App. 868, 686 N.W.2d 619 (2004) (this court affirmed district court's award of joint legal custody, with physical custody of parties' minor child awarded to mother, despite failure of parties to agree on joint legal custody and mother's testimony that communication between herself and father had been nearly nonexistent and that they have had number of confrontations since separation). However, the key to all of the cases cited above was the appellate court's deference to the trial judge who had heard and observed the witnesses.

### (iv) Did District Court Abuse
### Its Discretion?

In light of the evidence presented as described above, and giving deference, as we must, to the district court, which heard and observed the witnesses, we find the district court did not abuse its discretion in awarding joint legal and physical custody of the minor children to the parties.

### (c) Active Appreciation

Jennifer claims the district court erred by applying the active appreciation rule in determining that the retained earnings of Jennifer's gifted nonmarital asset were part of the marital estate and should be equitably divided.

### (i) Applicable Law

[8-10] The appreciation or income of a nonmarital asset during the marriage is marital insofar as it was caused by the efforts of either spouse or both spouses. *White v. White*, 304 Neb. 945, 937 N.W.2d 838 (2020); *Stephens v. Stephens*, 297 Neb. 188, 899 N.W.2d 582 (2017). The active appreciation rule sets forth the relevant test to determine to what extent marital efforts caused any part of the appreciation or income. *Id*. Appreciation caused by marital contributions is known as active appreciation, and it constitutes marital property in the first instance. *Id*. In contrast, passive appreciation is appreciation caused by separate contributions and nonmarital forces. *Id*.

[11-14] Accrued investment earnings or appreciation of nonmarital assets during the marriage are presumed marital unless the party seeking the classification of the growth as nonmarital proves: (1) The growth is readily identifiable and traceable to the nonmarital portion of the account and (2) the growth is not due to the active efforts of either spouse. *Id*. The burden is on the owning spouse to prove the extent to which marital contributions did not cause the appreciation or income. *Id*.

Despite the importance of each employee in a company, a company's value for purposes of active appreciation is attributable only to the efforts of first-tier management or similar persons with control over the asset's value. First-tier management is responsible for ensuring the policy, direction, and good will that contributes most directly to the value of a company's stock. Courts have uniformly rejected arguments by the owning spouse that the universe of persons in a company that effect its value is so large that no one person has any significant effect.

Even favorable market conditions are not passive inasmuch as they create merely the opportunity that the skilled, owning spouse detects and seizes. Nor does an argument that the "'ground work'" for growth was laid before the marriage preclude as a marital asset substantial appreciation of a company's value during the marriage. No person wears all hats in a complex business operation, but it is nevertheless possible for one person to be critical to such operation's growth and development. The appreciation of a company's stock may be due not just to a first-tier manager's direct efforts, but to his or her mere presence, when the individual is identified with the business entity and tied to its good will.

*Stephens v. Stephens*, 297 Neb. at 207-08, 899 N.W.2d at 596.

### (ii) Evidence From Trial

Jennifer testified that she works for her family's businesses, including Eriksen Construction. She is also part owner of Eriksen Construction, owning 8.30565 (hereafter 8.3) percent of the company; she and her three siblings were each gifted shares by her father and stepmother in 2014 and 2015. Jennifer has been an officer at Eriksen Construction since 2011 and has been otherwise involved since 2010. She is the vice

president of Eriksen Construction, and as such, she handles the administrative side of the day-to-day operations, e.g., human resources. Her job "is to oversee a lot of the business functions, all of the insurances, the health and medical plans, the 401k. [She] oversee[s] all of the safety. [She does] a lot of oversight with the project managers." She said that someone else handles the construction side of the project managers and that she "handle[s] their vacation when they take vacation requests, [she] make[s] sure they get information out to the jobsites, and so forth." Jennifer has not signed any loans or cosigned any notes on behalf of the company.

Jennifer earns a salary of approximately $87,000 per year, and she receives a yearly bonus, but that fluctuates; in 2017, her bonus was $8,000. Jennifer denied deferring any salary in exchange for increasing the earnings of Eriksen Construction. She was not aware of any efforts she made to increase the value of the company, other than what her job duty was (and for which she was paid). Jennifer stated:

> I guess my job duty is more of the administration side of the company. I'm the one that people tell me I spend too much of the company's money, whereas the growth of the company would come from [the chairman of the company], and [the president of the company], and the construction duties and those types of things.

Jennifer's father testified that he is the chairman of Eriksen Construction and oversees the running of the company.

Edward Schroeder is a certified public accountant. He has done tax preparation for Jennifer and Eriksen Construction for the past 5 years. Schroeder was aware that Jennifer is an 8.3-percent minority owner of Eriksen Construction, which is a subchapter S, pass-through corporation. He explained that the income or loss recorded in pass-through entities each year is "passed through to the shareholders, according to their proportionate ownership, and they have to pay taxes then on that percentage of the income that has been reported." Schroeder prepared Jennifer's K-1's for 2015, 2016, and 2017 (exhibits

31, 30, and 29, respectively). Box 1 on each K-1 reflects the ordinary business income of the S corporation based upon Jennifer's percentage of ownership; however, Jennifer does not receive that pass-through income. According to Schroeder, "[E]ven though you're an owner of a pass-through entity, that does not necessarily mean that you took any assets or cash out of that entity, or that you have any rights to have any cash or property distributed out." He further stated, "At an 8 percent ownership level, you would not have the power to say 'If this company made money, I want some of it.'" When asked what happens to the ordinary business income for Eriksen Construction if it is not distributed to the shareholders, Schroeder responded, "It would normally go into an accumulation of equity." The chairman of Eriksen Construction testified that if there are earnings that are not distributed, they stay in the corporation. According to Schroeder, Eriksen Construction is a bonded company, which means, "When you do larger construction projects, the people that you do them for want you to make sure you're going to finish that project," they require "bonding" where "an insurance company, of sorts, will actually insure you to complete that project and pay the people you're working for to get it done, if you don't do it." The insurance companies "have requirements of certain amounts of liquidity and equity for you to get a certain amount of bonding." So, "the equity in a corporation that has bonding is very critical to the size or the amount of jobs that they can actually do."

Regarding the increase in value of the company, the following colloquy was had between Matthew's counsel and Schroeder.

Q. Now, but you said that the retained earnings go into the coffer towards equity, correct? That's what you said earlier.

A. Retained earnings is one of the categories under equity.

Q. Okay.

A. Like common stock, that's part of your equity.
Retained earnings is part of your equity.

Q. . . .

And is it — is it a pretty fair assumption that if your —
let's say there is, just hypothetically, $500,000 of retained
earnings in one year the company kept. . . .

A. Of — of earnings, you mean?

Q. Uh-huh.

A. And they didn't do — do any distributions of it?

Q. Correct.

A. Okay.

Q. Can we assume that, at a base minimum, the
company has increased by the value of those . . .
retained earnings?

A. Nope.

Q. Why is that?

A. Because the — it's all based on what a willing
buyer would pay for it.

Just because you increase the retained earnings by
some kind of profit — you could have sold a building,
made a half million dollars on it, added that to retained
earnings, and you would have not had any more value
at all.

Q. Okay.

A. So no. Those two things are totally unrelated.

Q. The stock was granted at — at book value in the gift
returns, correct?

A. No. It was based on an appraisal.

Q. It was based on an appraisal.

So it was based on fair market value at that —

A. Yes.

Q. — time?

A. Uh-huh.

Q. So even though the stock was gifted at fair market
value, and even though you said that retained earnings go
to equity — increasing the equity in a company —

A. Yes.

Q. — we can't assume that, at a base minimum, that the increase in value of the company goes up dollar for dollar with the retained earnings?

A. A bad assumption.

Q. Okay. Well, wouldn't . . . taking that approach be more in accordance with what we call a book valuation of the company?

A. The approach you're talking about?

Q. Uh-huh.

If we just took assets, minus liabilities, that's your book value?

A. Yes.

Q. And in the span of the way you value businesses, can we agree that the book valuation would usually produce your low-end value as opposed to other forms?

A. I wouldn't start with that value in valuing any business.

Q. Okay. Just to be clear again . . . you said that the stock was granted at fair market value to [Jennifer], based on the appraisal at that time?

A. That's what's required by the 706.

Then, on redirect examination, the following colloquy was had between Jennifer's counsel and Schroeder.

Q. Are you aware if Eriksen Construction . . . had shown any growth, since [Jennifer] was gifted those shares, in 2014 and 2015?

A. So growth is a little bit tough to define. You're talking about sales growth? You're talking profit growth? Or are you talking about —

Q. Sure. . . . I'll rephrase it.

A. I — I haven't done a new appraisal, so I don't know if it's worth more or less —

Q. If —

A. — if that's what you're asking.

Q. If these K-1s show some income — Ordinary business income on box 1 for every year since she was gifted those shares, would it be fair to say it's likely seen some appreciation in the asset, or is that not fair to say?

A. There's lawsuits — I mean, you know, there's all kinds of factors that change the picture on what something is worth. I just cannot testify to you that necessarily that means that it's going to go up. It's just not all the things that you have to look at.

Bradley Larson is a certified public accountant. He is accredited in business valuation and is certified in financial forensics. Larson stated he does "income tax returns, corporation, individual — retirement plan — type of tax returns" and "consulting with small businesses, individuals, [and] professional practices." He also does "litigation support" which "encompasses a lot of various areas, such as business valuation, forensic accounting, business interruption calculations, economic loss calculations, those types of things." The district court found that Larson was an expert for business valuation.

Larson testified that there are three "main approaches" to business valuation:

There's asset approach, and what you're doing there is you're looking at the hard assets of the company, you're looking at the liabilities of the company and you're really just subtracting off those liabilities from the assets and coming up with what the value is. That's kind of the asset approach.

There's a market approach. Most people would be familiar with that from a real estate perspective. It's — you know, when you're do [sic] real estate you look at a house — if you can find a house across the street that sold and it's the same as your house, it's a good indication of what your house is. The same thing with business valuation. If you can find the sale of another business like your business that you're valuing, it's a good indication

of what your business is worth. So that's kind of the market approach.

And then the last approach is the income approach. Again, you're looking at the financial benefits of the company, the income of the company and you're translating that into a value. You're converting that income stream to a value and that's the income approach.

Larson added that in an income approach, there is "[g]enerally" an intangible goodwill value involved.

Larson explained that the book value approach would be one method within the asset approach: "[Y]ou take the assets, whatever that value is, you subtract off what the liabilities are, and the resulting value is the equity." He continued:

[I]f you're just using the asset approach, you're looking at — or the book value, you're looking at those assets at a historical cost or a historical-depreciated cost. So if you bought — for example, if you bought a building 30 years ago and it depreciated over 30 years, on that approach, that building isn't worth what its appraised value is, under the book value. It's worth — it's depreciated cost, which might be close to zero.

He then further continued by saying:

So when you're talking about book value, you've got to remember it's a historical-cost basis, not what you paid for that particular asset.

But it does relate to what you paid for it on the other item, such as cash, and that's a dollar-for-dollar value. So, again, you're looking what the cost — depreciated-cost basis of those assets, subtracting off the liabilities, resulting in an equity value, which is book value. And what that book value really represents is the accumulation of the money you put into the company, the money you took out of the company, and then either the earnings or loss that had been generated by the company.

According to Larson, of the three business valuation approaches, the book value is usually going to produce the lowest value.

Larson did not know the parties prior to this case, but he prepared Matthew's personal taxes in 2017. And for purposes of this case, Larson was asked to "analyze and determine the amount of earnings being generated by Eriksen Construction . . . applicable to child support, and determine if there was any increase in value, based on the retained earnings of [Jennifer's] interest in Eriksen Construction." Larson reviewed the parties' individual tax returns; the K-1's issued by Eriksen Construction for 2015, 2016, and 2017; and the gift tax returns of Jennifer's father and his wife for 2014 and 2015. Larson also reviewed an affidavit by Schroeder.

Larson stated:

> The numbers on the K-1 are pretty straightforward of what they represent and it's — it would be general knowledge, in the accounting profession, that earnings that are not distributed are retained by the entity, which would, therefore, increase the book value of the entity, which, in this particular case, would increase the value of that ownership interest.

The following colloquy took place between Matthew's counsel and Larson.

> Q. Okay. . . . [I]f an accountant were to hypothetically say he does not agree that it's a reasonable assumption that a value of a company increases dollar for dollar with retained earnings, what would your response be to that?
>
> A. In this particular case, I would disagree with that. In this particular case, it would, at a minimum, increase dollar for dollar.
>
> Q. Why is that?
>
> A. Multiple reasons. The — the stock had been recently valued for gift tax purposes and it was reported on the gift tax return as the value being equal to the retained earnings or the basis in the entity, which is, again, the book value in an S Corporation.
>
> Q. Would that have been the 2015, 709 gift tax return from the Eriksens to [Jennifer]?

A. That's correct.

And then, in addition to that, just from business valuation knowledge, on a profitable entity, if you are retaining those earnings, that increases the book value and is going to increase the value of the company.

Q. Okay. And so did you ultimately make a conclusion about — first of all, how many — about the retained earnings with regard to [Jennifer's] 8 percent interest in Eriksen Construction and any increase in value that may have occurred?

A. Well, in 2015, there was approximately $26,000 of earnings that were retained by the company.

And, in 2016, there was approximately $76,000 of earnings retained by the company.

And so the combination of those two years is approximately $102,000.

Q. Okay. And so are you saying that the company has, at a minimum, increased at that value?

A. I'm saying that [Jennifer's] interest in the company has increased, at a minimum, $102,000 during 2015 and 2016.

Larson agreed that typically book value is going to be the low-end value, which is part of the reason why he could reasonably conclude that Jennifer's 8.3-percent stock increased at least a minimum of $102,000. Exhibit 89 is the summary Larson prepared from the information contained in Jennifer's 2015 and 2016 K-1's for Eriksen Construction, showing how he arrived at the $102,000 figure (actually $102,310) for retained earnings, which he said is also reflective of the minimum amount Jennifer's interest in the company had increased. Exhibit 89 shows that the pass-through income allocated to Jennifer's ownership interest was $129,420 in 2015 and $215,051 in 2016. After additions and deductions for interest income, ordinary dividends, long-term capital gains and losses, "Section 179" expenses, tax-exempt interest income, and nondeductible expenses, the total net income was $93,919 in 2015.

From that, Larson subtracted the $67,499 distribution made to Jennifer in 2015, which left $26,420 in earnings retained by Eriksen Construction. He did the same type of calculations for 2016, showing a total net income of $201,804, from which he subtracted the $125,914 distribution made to Jennifer in 2016, which left $75,890 in earnings retained by Eriksen Construction; the total of the 2015 and 2016 retained earnings equaled $102,310, which Larson opined was the minimum increase in value for Jennifer's interest in the S corporation.

On cross-examination, Larson testified that the preferred method for business valuation is "really fact specific on each one," but "[i]t's not uncommon to use the asset approach in a construction business." When asked what tax documents he would ideally have at his disposal in order to accurately determine the book value of that business, Larson responded, "Generally you'd want financial statements and income tax returns" from the corporation; he did not have those in this case.

Larson was asked, under a hypothetical, if you sell a building or buy a building, if it is still on the balance sheet. Larson responded:

> For example, if you had [a] $100,000 building with no appreciation, and you sold it — so you have [a] $100,000 building and there's nothing else, you've got $100,000 of book value. You sell that building for $110,000, you've now got a gain of $10,000 on that building. Right? But now you have $110,000 of cash and you've got $110,000 of book value. That $10,000 would have showed up on this K-1 as capital gain income and we would have captured that $10,000 from the K-1.

Larson explained, "The assets change from a building to cash, but the book value only changed by the gain, which is reflected on the K-1s." He agreed that is another reason why it can be assumed that the value of Jennifer's 8.3-percent interest in the business has increased, at a minimum, to an amount equal to the retained earnings for 2015 and 2016.

### (iii) District Court's Ruling

The district court, after noting that Jennifer serves as vice president of Eriksen Construction, stated:

> Based upon the evidence that [Jennifer] had retained earnings from 2015 and 2016 totaling $102,310, and upon the testimony of . . . Larson, the Court finds that [Jennifer's] non-marital stock grew in value in an amount at least equivalent to the total retained earnings, and the growth in value is a marital asset for purposes of dividing the marital estate.

### (iv) Did District Court Abuse Its Discretion?

In light of the evidence presented, and giving deference, as we must, to the district court, which heard and observed the witnesses, we find the district court did not abuse its discretion by determining that Jennifer's nonmarital stock grew in value in an amount at least equivalent to her share of the total retained earnings ($102,310) from 2015 and 2016 and that the growth in value was a marital asset.

As stated in *Stephens v. Stephens*, 297 Neb. 188, 899 N.W.2d 582 (2017), accrued investment earnings or appreciation of nonmarital assets during the marriage are presumed marital unless the party seeking the classification of the growth as nonmarital proves: (1) The growth is readily identifiable and traceable to the nonmarital portion of the account and (2) the growth is not due to the active efforts of either spouse. It was Jennifer's burden to demonstrate that any portion of Eriksen Construction's appreciation was due to passive forces or the active efforts of third parties who would qualify as first-tier management or similar. See *id*. Here, Jennifer did not meet her burden to prove that the appreciation of her stock was nonmarital, as we explain below.

Jennifer was the vice president of Eriksen Construction. And Schroeder, who did tax preparation for Jennifer and Eriksen Construction, acknowledged that a vice president would be

a key officer. Jennifer stated that she handles the administrative side of the day-to-day operations, e.g., human resources, for the company. Her job "is to oversee a lot of the business functions, all of the insurances, the health and medical plans, the 401k. [She] oversee[s] all of the safety. [She does] a lot of oversight with the project managers." She said that someone else handles the construction side of the project managers and that she "handle[s] their vacation when they take vacation requests, [she] make[s] sure they get information out to the jobsites, and so forth." Although Jennifer claimed that others in the company, such as the chairman (who is her father) and the president, as well as the construction side of the business, were responsible for the growth of the company, that does not mean that her role on the administrative side was not important. The district court found Jennifer's role as vice president significant in its determination that the growth in value of her nonmarital stock was a marital asset, and we find no abuse of discretion in the district court's determination. Nor do we find an abuse of discretion in the district court's reliance on Larson's testimony when determining that Jennifer's nonmarital stock grew in value in an amount at least equivalent to the total of her share of the retained earnings ($102,310) for 2015 and 2016, as calculated by Larson. Even Schroeder acknowledged that any ordinary business income for Eriksen Construction which was not distributed to the shareholders "would normally go into an accumulation of equity." And the chairman of Eriksen Construction testified that if there are earnings that are not distributed, they stay in the corporation. When asked if such retained earnings would increase the value of the corporation, Schroeder's answers were vague and evasive. We find no error in the election by the district court to rely on Larson's testimony instead. See *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017) (when evidence is in conflict, appellate court considers, and may give weight to, fact that trial judge heard and observed witnesses and accepted one version of facts rather than another).

## 2. Matthew's Cross-Appeal

[15,16] On cross-appeal, Matthew claims the district court erred by not including for purposes of child support "the substantial distributions" Jennifer received from Eriksen Construction in 2015 ($67,499), 2016 ($125,914), and 2017 ($67,525). Although these distributions are tied to Jennifer's inherited and nonmarital interest in the corporation, the child support guidelines provide for consideration of income derived from all sources, including nonmarital sources. See, *Marcovitz v. Rogers*, 267 Neb. 456, 675 N.W.2d 132 (2004) (profits generated from real estate development entities, in which ex-wife had inherited ownership interest, constituted income for purposes of calculating child support); *Hughes v. Hughes*, 14 Neb. App. 229, 706 N.W.2d 569 (2005) (for purposes of child support, husband's income included income generated from his mother's trust); Neb. Ct. R. § 4-204 (rev. 2016) (total monthly income is income of both parties derived from all sources, except all means-tested public assistance benefits which includes any earned income tax credit and payments received for children of prior marriages). The paramount concern in child support cases, whether in the original proceeding or subsequent modification, remains the best interests of the child. *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018).

In determining Jennifer's income for the purpose of calculating child support, the district court included Jennifer's wage income as reported on her W-2 form, but did not include her K-1 distributions. The court explained:

> [Matthew] argues for inclusion of [Jennifer's] K-1 distributions. The Court finds that [Jennifer] has produced sufficient evidence that the character of the distributions is such that inclusion of the same as income for child support purposes would create an unjust result, because the income is speculative and [Jennifer] has no control over the timing or amount of these distributions.

In support of his argument that the distributions should have been included as income for child support purposes, Matthew cites to *Coffey v. Coffey*, 11 Neb. App. 788, 661 N.W.2d 327 (2003) (funds used by mother to pay estimated tax liability for S corporation and family partnership for 3 years came from corporation and family partnership and it was appropriate to include such in mother's income; because amounts varied significantly, it was appropriate to average). He contends that *Coffey* is "absolute precedent for what the district court should have done in these proceedings." Brief for appellee on cross-appeal at 45.

However, since this court's opinion in *Coffey*, several other jurisdictions have addressed distributions made to shareholders in order to offset the shareholder's proportionate share of the taxes on an S corporation's pass-through earnings. Those jurisdictions have determined that distributions to cover corporate tax liability should not be included as income for purposes of calculating child support. See, *Trojan v. Trojan*, 208 A.3d 221 (R.I. 2019) (father was sole shareholder of S corporation drywall business; approximately $1 million in retained earnings for bonding purposes and distribution used to pay taxes on pass-through income properly excluded for child support purposes); *In re Marriage of Moorthy*, 2015 IL App (1st) 132077, 29 N.E.3d 604, 390 Ill. Dec. 672 (2015) (concluding that amounts used to pay father's proportionate share of taxes on S corporation's earnings did not constitute disbursements to him that should have been included in child support calculation); *Diez v. Davey*, 307 Mich. App. 366, 861 N.W.2d 323 (2014) (funds distributed by S corporation to shareholders to actually offset payment of taxes on earnings retained by corporation should not be included as income to shareholder-parent under Michigan Child Support Formula); *Tebbe v. Tebbe*, 815 N.E.2d 180, 184 (Ind. App. 2004) (holding that "pass-through S-corporation income that is merely disbursed to offset pass-through shareholder tax liability, and which does not increase the shareholder's actual income,

should not be included in child support calculations"); *In re Marriage of Brand*, 273 Kan. 346, 44 P.3d 321 (2002) (historical information regarding respondent's interests supports district court's conclusion that amounts distributed to respondent were for sole purpose of paying his share of corporation's taxes and were not available to pay support). See, also, *J.S. v. C.C.*, 454 Mass. 652, 912 N.E.2d 933 (2009) (generally agreeing with reasoning in decisions of courts in several jurisdictions that have held that portion of distribution designated to pay taxes on earnings legitimately retained by corporation is not available to shareholder parent to satisfy child support obligation); *Walker v. Grow*, 170 Md. App. 255, 907 A.2d 255 (2006).

We find the reasoning of the jurisdictions set forth above to be persuasive, and we choose to be guided by them here, particularly given the testimony from both accountants that a common purpose of such distributions is to cover a shareholder's tax liability on his or her share of the S corporation's pass-through income. While it was disputed whether the amounts distributed here exceeded that tax liability, the evidence certainly supported that the intended purpose of the distributions in this case was to offset personal tax consequences resulting from the S corporation's pass-through income.

Jennifer testified that there was a "distribution four times a year that's issued to cover the taxes that we have to pay" and that "[i]t's usually issued about a week before the taxes are due, and we deposit it, and then make the tax payment." As explained by Schroeder, the "biggest complaint" in being a minority shareholder of a subchapter S corporation is that "you can owe taxes on . . . what they call phantom income and have no cash to pay it." He explained that the distributions are based on quarterly estimates of the S corporation's tax liability. He further explained, "To avoid a penalty, you have to have at least a hundred percent of the prior year's tax paid in. So sometimes that makes you pay in more than what . . . the income is." For example, when questioned about why

Jennifer's 2017 K-1 showed her share of the S corporation's ordinary business income was only $57,975, and yet her distribution was $67,524, Schroeder explained that the distribution is "not related to that year." Similarly, the $125,914 distribution made to Jennifer in 2016 would relate in part to her share of the ordinary business income in 2015.

According to Schroeder, the purpose of the distributions was to cover the estimated tax liabilities; the "distributions were to pay taxes on the taxable income of the company that she . . . was allocated, based on her ownership, but that she did not receive." And according to the chairman of Eriksen Construction, he alone makes the decision as to what, if any, distributions are to be made "based on what [his] quarter deposits are for income tax." He determined that no distributions would be made for the 2018 tax year because after getting his "taxes back about a week ago," he saw that he had no quarterly deposits to make, since he had "overpaid." He acknowledged that this was due to the fact the company did not do as well in 2017 as it had previously. Jennifer testified that it did not look like she would be receiving a distribution to cover taxes for 2018 because "the 2017 estimated taxes were based on the 2016 income, and so we paid in those estimate[]s." Since the corporation's income for 2017 "was so much lower . . . everybody overpaid. And when that happens, the refund goes towards your quarterly estimates for 2018." Jennifer said neither she nor anybody else in the company would have any estimated quarterly taxes to pay in 2018 because "everybody overpaid last year and that all went directly into our estimate[]s for this year."

Although Larson agreed that it was common in a closely held family business that "there are distributions made to pay taxes," he disagreed that the distributions at issue were only enough to pay taxes because the distributions were "in excess of what the taxes" had been. In support of his position, Larson used Jennifer's 2016 K-1 and the parties' 2016 joint personal tax return as an example. According to the

K-1, Jennifer's share of the corporation's ordinary business income in 2016 was $215,051 and her share of "Section 179" expenses were $41,528. This resulted in S corporation income of $173,523 ($215,051 − $41,528) being reported on the parties' joint federal tax return. Jennifer's distribution in 2016 was $125,914. Larson claimed this was $50,000 in excess of the total tax liability owed by the parties in 2016. When asked if the distribution bore a close correlation with the amount of taxes owed, he responded, "It doesn't appear to." Larson's position that there were distributions made in excess of the tax liability associated with the S corporation's pass-through income for a given year has merit when looking strictly at a given tax year, such as in the 2016 example just provided. However, Larson did not address the earlier testimony about distribution overpayments in a tax year potentially being applied to taxes owed in a subsequent year. Larson was not asked about, and therefore did not address, how that excess might be applied to taxes in subsequent years or possibly result in zero distributions in a subsequent year to adjust for a prior excessive distribution as described by Schroeder, the chairman of Eriksen Construction, and Jennifer.

Therefore, based on the evidence presented to the district court, we cannot say the court abused its discretion by determining that the inclusion of the distributions as income for child support purposes in this case would create an unjust result. There is no question that the S corporation's pass-through income substantially increases Jennifer's personal tax liability and that the distributions determined by the chairman from year-to-year are intended to cover that tax liability. And while it is certainly possible for distributions to be paid out in excess of that tax liability, and for such excess to potentially be considered as income for purposes of calculating child support, the evidence here supports the district court's conclusion that to do so in this instance would be unjust.

[17] Accordingly, we conclude that distributions made to a shareholder of a subchapter S corporation, as reported on

a K-1, should not be included as income for purposes of calculating child support for those portions of the distribution intended to offset the shareholder's personal tax liability on his or her proportionate share of the S corporation's pass-through earnings. However, if the evidence establishes that the total distribution exceeds the shareholder's tax liability on his or her proportionate share of the S corporation's pass-through earnings, such excess portions of the distribution may be included as income for child support purposes unless the evidence demonstrates that such excess amounts are reasonably expected to be applied to future tax liabilities. In the present case, the inherited shares were relatively new (gifted to Jennifer in 2014 and 2015), so how a possible excess distribution in 2017, for example, would affect distributions in 2018, was not yet known, other than the testimony indicating that the excess from 2017 would be applied to tax liabilities in 2018 and that there would be zero distributions in 2018. Certainly, an analysis correlating a shareholder's distributions to his or her tax liabilities over a longer period of time may reveal a regular pattern of excess distributions which cannot be solely tied to the tax liabilities associated with the S corporation's pass-through income. In such cases, the amount of a shareholder's distribution which exceeds the correlated tax liability for an S corporation's pass-through income may be subject to inclusion as income for child support purposes. However, as noted, we cannot say the district court abused its discretion by excluding the distributions from Jennifer's income for child support purposes based on the evidence presented in this case.

Matthew also argues that "[r]egardless of the purpose for the distributions, Jennifer was not legally obligated to use the distributions received for said purpose," and that "[t]hus, they were income to her like any other income." Brief for appellee on cross-appeal at 42. But as Jennifer aptly notes in response, "[t]he taxes were due and had to be paid in some fashion with the same amount of resources," and therefore, her "obligation

to pay the taxes would not dissipate had she decided to pay some other obligation." Reply brief for appellant at 3. And Jennifer testified that she uses the distributions to pay taxes, "because I don't have other funds to pay those taxes."

We have already explained why the district court did not abuse its discretion by excluding Jennifer's K-1 distributions as income for child support purposes. Whether Jennifer has the discretion to use those particular distributions to actually pay or not pay the additional tax liability on the S corporation's pass-through income does not change the fact that the liability is incurred and must be paid. While distribution amounts in excess of the incurred tax liability can be used at Jennifer's discretion, the evidence presented in this case indicated that any excess distribution would be applied to the tax liability for the 2018 tax year and that no 2018 distributions would be made. Thus, as previously stated, based upon the evidence presented to the district court, we cannot say it abused its discretion by deciding not to include the distributions as income attributable to Jennifer when calculating child support.

## VI. CONCLUSION

For the reasons stated above, we affirm the decree, as amended by the district court, in all respects.

Affirmed.