Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/13/2024 09:08 AM CDT

Krista K. Conley, appellant, v.
Jason D. Conley, appellee.

___ N.W.3d ___

Filed August 13, 2024.    No. A-23-662.

1. **Modification of Decree: Child Custody: Visitation: Child Support: Appeal and Error.** Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed by an appellate court de novo on the record, and will be affirmed absent an abuse of discretion.

2. **Visitation: Appeal and Error.** Parenting time determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion.

3. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

4. **Modification of Decree: Child Custody: Proof.** Custody of a minor child will not ordinarily be modified absent a material change in circumstances, which shows either that the custodial parent is unfit or that the best interests of the child require such action.

5. ____: ____: ____. It is the burden of the party seeking modification to show a material change in circumstances.

6. **Modification of Decree: Child Custody: Words and Phrases.** A material change in circumstances is the occurrence of something that, if it had been known at the time the most recent custody order was entered, would have persuaded that court to decree differently.

7. **Modification of Decree: Child Custody.** Circumstances having occurred before the most recent custody order are relevant in a modification proceeding only insofar as they bear on whether the change in circumstances since the most recent custody order are material and substantial.

8. \_\_\_\_: \_\_\_\_. Before custody is modified, it should be apparent that any material change in circumstances alleged will be permanent or continuous, not merely transitory or temporary.

9. **Child Custody.** In determining whether there has been a material change in circumstances, if a child is of sufficient age and has expressed an intelligent preference, the child's preference is entitled to consideration, alongside other factors.

10. **Trial: Evidence: Appeal and Error.** Witness credibility and the weight to be given to testimony is within the province of the trial court. An appellate court will consider the fact that the trial court saw and heard the witnesses and observed their demeanor while testifying, and will give great weight to the trial court's judgment as to credibility.

11. **Visitation.** In formulating a parenting plan, the best interests of the children are the primary and paramount considerations.

12. **Modification of Decree: Child Custody: Parties: Jurisdiction.** In a custody modification case, a court lacks jurisdiction over nonparties and has no authority to restrict their independent decision to attend the children's events.

13. **Child Support: Rules of the Supreme Court.** Although child support should generally be set by the Nebraska Child Support Guidelines, the guidelines offer flexibility and guidance, while understanding that not every child support scenario will fit neatly into a calculation structure.

Appeal from the District Court for Douglas County: Todd O. Engleman, Judge. Affirmed as modified.

C.G. (Dooley) Jolly, of Adams & Sullivan, P.C., L.L.O., for appellant.

Kristina B. Murphree and John Andrew McWilliams, of Gross, Welch, Marks & Clare, P.C., L.L.O., for appellee.

Moore, Riedmann, and Bishop, Judges.

Riedmann, Judge.
## I. INTRODUCTION

Post divorce proceedings, the relationship between a mother and two of her children deteriorated. The father sought a custody modification, and the mother filed a counterclaim,

asserting parental alienation by the children's father. The district court rejected her argument and modified both custody and the parenting plan in favor of the father. The mother appeals. Finding no abuse of discretion, we affirm as modified.

## II. BACKGROUND

Krista K. Conley and Jason D. Conley were married in January 1993 and have three children: Charlie Conley (born in 2005), Sophie Conley (born in 2008), and Elliott Conley (born in 2013). A divorce trial was held in October 2020, and a decree was entered in September 2021. Pursuant to a stipulated parenting plan, the parties were awarded joint legal custody of the three children and joint physical custody of Sophie and Elliott, to be exercised on a "3-2-2" schedule with a 2-week rotation. Jason was awarded sole physical custody of Charlie, and Krista was awarded parenting time with Charlie every Wednesday evening and every other weekend from Friday through Sunday.

### 1. CONTEMPT ACTION

On November 24, 2021, Krista filed a contempt action against Jason. She asserted, in part, that Jason was not abiding by the decree's parenting time provisions and the provisions regarding the parties' communication. Krista filed another contempt action on December 22, in which she asserted Jason was in willful violation of several court orders. She alleged that Jason was allowing Charlie to decide whether to attend parenting time with her, was "impart[ing] his perspectives about [Krista] to Charlie," and had "almost entirely destroyed any hope [Krista has] of having a future with Charlie [and has] moved on to Sophie."

In response to Krista's applications for a contempt order, Jason filed a complaint to modify the divorce decree. He requested that the parenting plan be revised and that he be awarded sole legal and sole physical custody of Sophie and sole legal custody of Charlie.

Following a hearing in January 2022 on Krista's complaint for contempt, the court found that Jason had willfully and contumaciously violated certain provisions of the parenting plan and the dissolution decree. Specifically, it found that Jason had "engaged in forcibly and intentionally placing the children of the parties in the middle of decisions regarding parenting time and other issues." It further found that Jason's "actions have empowered the children to negotiate parenting time and other parenting matters directly with [Krista] in direct violation of the parenting plan and the best interest of the minor children."

Prior to imposing a purge order for Jason, the district court had a discussion with Charlie and Sophie on the record. It provided them with a copy of the purge order and explained its provisions to them. It advised the children that it did not just expect them to follow the provisions, but, rather, it "demand[ed]" it. It stated:

> So starting off, neither parent will pick up the kids during the other parents [sic] parenting time, period. There will be no more calling dad to have dad come get me at moms [sic], during moms [sic] parenting time. It's over, done. . . . I took a lot of your parents [sic] decision making away by this as well. I'll decide what's going to go on. So they have to make specific requests to changes [sic] things, but the point is we're going to stop calling dad to come pick us up during moms [sic] parenting time, we're going to stop causing all kinds of problems and hopefully the way I've fashioned it, there won't be a need for it.

It further forbade the parents and children from audio or video recording each other without the other's knowledge. Importantly, it imposed a 2-month temporary parenting schedule that was to be followed "[w]ithout deviation, without negotiation, and without discussion." The temporary schedule provided parenting time for Krista as follows:

Elliott — Parenting time shall be every Sunday commencing at 4pm and concluding on Wednesday at drop-off at school or 9am.

Sophie — Parenting time shall be every Thursday from after school or 3:00 pm until 7:30 pm[] and every other weekend commencing on Sunday at 4pm and concluding on Wednesday at drop-off at school or 9am. This schedule shall commence February 6, 2022.

Charlie — The parenting schedule shall be every Wednesday from after school or 3:00 p.m. until 7:30 p.m. Every other weekend beginning on Friday after school or 3:00 p.m. until Saturday at 3:00 p.m. This weekend schedule shall commence on February 4, 2022.

If exchanges are not thru school, the parent ending their parenting time is responsible for dropping off the children at the other parents [sic] at the designated time.

As a result of the purge order, the parties stipulated to stay the modification proceedings. In April 2022, a hearing was held on the parties' compliance with the purge order. The parties reported a "marked improvement" of the parenting time, with the exception of Sophie. A subsequent hearing was held in June, and the court found that Jason had purged himself of contempt. It reinstated the parenting plan contained in the divorce decree and lifted the stay of the modification proceedings.

## 2. MODIFICATION PROCEEDINGS RESUME

Jason filed an amended application to modify custody, parenting time, and child support on July 18, 2022. He sought sole legal custody of Charlie, sole legal and physical custody of Sophie, and a reduction of Krista's parenting time for all three children. Krista filed a counterclaim in which she alleged that Jason had engaged in conduct to alienate Krista from the children. She sought sole legal custody and joint physical custody of all three children. Trial was held in March 2023.

(a) Charlie

The evidence at trial revealed a highly strained relationship between Krista and both Charlie and Sophie. Charlie, age 17 at the time of trial, testified that if he had been asked 1½ years before trial, he would have said he hated his mother. At the time of trial, however, he explained that although he does not "hate" her, he believes she is not a good person to have in his life and he does not want to be a part of hers. Prior to the imposition of the temporary parenting time order under the purge plan, Charlie would run away from his mother's house, he would call his father, and his father would pick him up. Because the district court told him he could no longer do that under the purge plan, he stopped. However, he did not interact with his mother; rather, he would spend nearly all his mother's parenting time either at work or with friends. When he was at Krista's house, he would spend his time in his bedroom. He testified that more time with Krista increased his stress; however, Krista testified that while the purge plan was in effect, her relationship with Charlie improved.

Charlie explained that his parents' separation occurred after an argument between his parents in September 2019, which he says he witnessed. He stated that Krista claims Jason pushed her to the ground; however, Charlie denied that happening. The police eventually arrived at the house because Krista called Jason's out-of-town sister and relayed her version of the events, and his sister called the 911 emergency dispatch number. Jason was handcuffed and placed in a police cruiser, but was eventually released and never cited. After that, Krista fled the house with Sophie and Elliott for 5 weeks. Charlie stayed with Jason during that time period. Charlie later relayed his memory of the incident to Krista that did not include Jason's pushing her, and Krista told him he was lying.

Charlie described two occasions on which Krista "call[ed] the police on [him]." One time involved an argument between him and Krista, and the other time was because he would

not get in Krista's car because he did not want to stay at her house. Both of those incidents, however, occurred before the contempt hearing.

Charlie's reasons for wanting to distance himself from Krista include a lack of trust and a lack of respect for her. He complained that Krista tells him she loves him "excessively" and uses words of affirmation instead of trying to work through problems with him. He accused her of ruining relationships he had established with friends. And based upon prior incidents where Krista had recorded him without his knowledge, he feels like she brings up topics to bait him into an argument so she can record it and hold it against him. In sum, Charlie regarded her as "a very antagonistic person."

#### (b) Sophie

Sophie, age 14 at the time of trial, last spoke to her mother on August 26, 2022. She remembers the specific date because she had written an affidavit for an August hearing indicating she wanted less time with her mother, but the court did not order it. The affidavit is an 11-page, single-spaced document, in which Sophie described everything she dislikes about Krista. Shortly thereafter, Sophie stopped speaking to her. Sophie testified that she started having problems with Krista sometime in 2021. She stated that she does not like the way Krista treats her and that she does not trust her. Sophie complained that Krista would read Sophie's text messages from her friends and from Jason, she would limit Sophie's screen time, and she would say she was not recording Sophie when she was. Sophie relayed a particular occasion when Krista took Sophie's bedroom door off its hinges because Sophie was locking it at night. Krista said Sophie had to spend more time with her to get it back.

Sophie was homeschooled until seventh grade. She described Krista's showing up at her middle school on her first day, "acting like a crazy person." According to Sophie, Krista tried to take a picture of her and then asked Sophie "to go take a

picture with some random person." Sophie won a citizenship award later that year, and the school requested that Krista write some comments describing Sophie, which were read to Sophie's class. Sophie found Krista's comments "embarrassing" because Krista referred to her as "spunky" and being "beautiful on the inside and out." Sophie included this as one of the reasons she should spend less time with Krista.

According to Sophie, she would rather not spend any time at Krista's apartment but realizes that is unrealistic. Krista began taking Sophie to a therapist, Dr. Glenda Cottam, in November 2022. Because it is family therapy, Krista is in the room with Sophie and Cottam. Sophie does not want to continue with Cottam because she feels "attacked" and that the therapist is "on [her] mom's side." When Sophie told Cottam she did not want to continue therapy, Cottam responded that they needed more time together. As a result, Sophie walked out and waited outside for the remainder of the session. Jason told Sophie she needed to keep going, so now Sophie attends, but refuses to speak.

### (c) Cottam

Cottam met with Krista and Sophie seven times beginning November 23, 2022. She reviewed a copy of Sophie's affidavit discussed above and spent 3 days going over its contents with Krista because it contained "a lot of pretty horrible stuff." After meeting Sophie, Cottam described her as "incredibly rude." According to Cottam, Sophie's major complaints were that Krista did not listen, invaded her privacy, read through her text messages, and yelled at her. Sophie had wonderful memories with Jason but could not recall any wonderful moments with Krista.

Cottam testified that Sophie "totally hates" Krista and will not give her another chance. She stated that "I find that a lot of kiddos that are even physically abused, will not reject their parent in the extreme way that I saw with Sophie's just total rejection of her mother. It was extreme." She also noted that

Sophie appeared "stony," without reaction to how her words made Krista feel. Cottam indicated that there were situations, such as Krista's calling the police on Charlie, that supported Sophie's feelings of distrust. However, Cottam did not believe that Sophie's rejection of Krista was "rational" and Cottam indicated that Sophie exhibited some "cognitive distortions."

Although not allowed to give an opinion on whether parental alienation was occurring, Cottam testified that "parental alienation is much worse than simple estrangement." "[E]strangement might involve a justified rejection of a parent," whereas "alienation is . . . unjustified [in] the eyes of a mature individual." Cottam outlined several factors indicative of parental alienation, many of which Sophie exhibited. Potential indicators of alienation include a complete dichotomy in which the child idolizes one parent and hates the other, strong alignment with one parent and total rejection of the other without a reasonable explanation, a child's belief that his or her beliefs are his or her own without anyone persuading them, parroting a parent's phrases and scenarios, rejecting not only the parent but everyone and everything associated with that parent, making absurd rationalizations for rejecting the parent, and being uncaring about hurting the targeted parent.

In addition to meeting with Krista and Sophie, Cottam has had seven sessions with Krista and Elliott. She also met with Jason for a little less than 2 hours over two occasions and described him as having "really, really . . . strong negative feelings towards the mom." She noted that both Jason and Sophie commented on privacy and Krista's sanity. Cottam also received information from both attorneys and had a conference call with both attorneys. She had also spoken with Rodney Burger, Sophie's individual therapist. Cottam recommended individual therapy for Krista with Sarah Batter. Cottam was stepping down as the family therapist, however, because Sophie "just hates" her.

### (d) Burger

Burger is a licensed, independent mental health practitioner. He began his treatment of Sophie about 1½ years before trial. Although Jason mows his lawn, Burger denied having any social relationship with him. Burger diagnosed Sophie with adjustment disorder with anxiety, as well as with depression. Unlike Cottam, Burger described Sophie as "very polite, cooperative, talkative at times." He described her relationship with Krista as "antagonistic at best." She has expressed a desire to never see her mother again, but he explained to her that because Krista is her mother, she is always going to be a part of her life; Sophie needs to try to make the best of the situation. Burger relayed that Sophie feels like she is not being heard, so when she is at Krista's house, she isolates herself in her room. He attributes Sophie's attitude to the divorce, and he was unaware that in early 2021 she had a good relationship with her mother. He did not involve Krista in therapy with Sophie because Sophie refuses to talk to Krista in therapy and has asked him not to talk to Krista.

### (e) Batter

Because of the relationship issues Krista has with Charlie and Sophie, and at the recommendation of Cottam, Krista sought individual therapy with Batter, a licensed independent clinical social worker. At the time of trial, Batter had met with Krista 17 times since September 2022 and their sessions focused primarily on Krista's asking what she could do better. Batter diagnosed Krista with adjustment disorder. Similar to Cottam, Batter did not provide an opinion on whether parental alienation was occurring but discussed the topic in general terms. She defined estrangement as "children rejecting a parent for a legitimate reason" and parental alienation as "children rejecting the parent for no legitimate reason." According to Batter, "Parental alienation is the children's . . . rejection of one parent, based on the influence of the other parent."

Batter relayed having viewed a video taken by Krista of Charlie and Sophie tearing down birthday decorations that Krista had put up. Krista indicated to Batter that she recorded events because she was fearful people would not believe what was occurring. Batter also discussed statements made by Krista relating to Jason's having a gambling problem and being financially and physically abusive to her. In Krista's description of the incident of September 2019, she told Batter that Jason pushed her to the floor and his family called the police. Batter did not recall, however, how Jason's family became aware of the incident.

### (f) Jason

Jason's recollection of the September 2019 incident was different. He recalled that Krista had been in a "mood" for the prior week because Jason suggested she stop homeschooling the children. That morning at breakfast, Krista was being rude to him and Charlie was with them in the kitchen having breakfast. The phone rang, and the "caller ID" indicated it was Jason's parents. As Jason went to answer the phone, Krista tried to grab the phone out of his hand. According to Jason, she "took a step back and she sat on the ground. She pointed at the phone and started saying, you pushed, you pushed me. Call 911." At this point, Charlie was in the hallway but could see what had happened in the kitchen. Jason denied pushing Krista.

After the police had come and gone and Jason and Charlie left for a preplanned event, Krista picked up Sophie and Elliott from a friend's house and left with them for about 5 weeks. Charlie remained with Jason during that time, and he only saw the other two children a couple of times in a public place. Krista would not disclose where they were staying.

Jason testified that Sophie and Elliott currently have a "3-2-2" schedule and that Charlie is with Krista every other weekend from 3 p.m. Friday until 3 p.m. Sunday and from 3

p.m. Wednesday until 3 p.m. Thursday; the next Wednesday he is there from 3 p.m. until 8 p.m. According to Jason, there have been no exchange problems since the purge order was entered in February 2022. The purge order changed parenting from February through July 4. Jason reported that the children liked the purge order schedule better, but after it ended, parenting time went back to the schedule set forth in the decree. Jason filed a motion for temporary orders, and Sophie authored the affidavit previously described in support of the motion. However, the parenting schedule remained the same. Jason explained that he filed the motion for modification because Sophie and Elliott kept talking about it.

Because Sophie was struggling with some of the divorce issues, Jason told her that if she ever wanted to talk to someone, he had a suggestion. A short while later, she stated she wanted to pursue it, so Jason made an appointment with Burger. He recommended Burger because he had briefly conversed with him through Jason's lawn business. Sophie had been seeing Burger pretty consistently for about 1½ years at the time of trial.

According to Jason, he had noticed a "big change" in Charlie in the 6 months prior to trial—his grades had improved, and he was taking responsibility for his own life and working toward the future. Charlie took it upon himself to arrange a college campus tour in Lincoln, Nebraska, and went by himself. Jason has also noticed that Charlie is being more respectful and polite when it comes to Krista.

Jason attended parent-teacher conferences for Sophie and described them as "fun" because teachers "gush about what a great girl" she is. He stated that when the purge plan ended, it was "rough" for Sophie, and that her desire to spend less time with Krista has never wavered.

Because of the court's admonitions following the contempt proceeding, Jason changed his behavior. He made sure Krista got her parenting time and the children cooperated in going.

He made sure they knew that no matter what was going on at Krista's house, they could not leave, and that he would not pick them up anymore. He also talked to the children about how they are allowed to talk to Krista—what is acceptable and what is not. Jason requested sole legal and physical custody of Charlie and Sophie.

### (g) Krista

In response to Jason's amended motion for modification, Krista filed a counterclaim and sought joint physical custody of all three children with a 50/50 parenting time schedule, as well as sole legal custody of all of them. She requested that Jason's parenting time be contingent upon the children's behaving properly when with Krista and that she be the one to make that determination based on identifiable objective criteria.

Krista confirmed that Sophie has not spoken to her since August 2022. Sophie does not accept gifts from Krista, "touch her [birthday] cake," or speak to Krista in therapy. In fact, other than therapy, Sophie will not be in the same room as her. Krista perceived a change starting in the fall of 2021. Prior to that time, Krista and Sophie would participate in many mother/daughter activities. Krista also offered a photograph and a video to support her testimony that through November 23, they had a good relationship. Krista first heard Sophie claim she was afraid of her in December. In February 2022, Sophie began removing her belongings from Krista's apartment and taking them to Jason's house. By August, she had removed everything.

Krista's recollection of Sophie's first day of seventh grade differed from Sophie's testimony. A video taken by Krista of the event was received into evidence that depicts Krista outside of the school, Sophie giving her a hug, and then Krista returning to her vehicle. Krista confirmed the video had not been altered and captured the entire interaction. Contrary to Sophie's testimony, there was no request that Sophie find a "random person" to have her picture taken with.

Although Sophie had stated in her affidavit that prior to entering public school she had never written a paragraph, Krista testified that between 2019 and 2021, Sophie took five, 12-week writing classes at a learning center for home-schooled students. An invoice for one of the classes and two of the essays Sophie wrote for that class were received into evidence.

Krista thinks Charlie influences Sophie and Elliott by parroting Jason's perspective about Krista to them. Krista relayed that Mother's Day of 2019 with the children was "wonderful" and that Charlie had made her a special gift. By Mother's Day of 2020, Charlie had told her he did not consider her his mother anymore and would not acknowledge the holiday in any way.

According to Krista, her relationship with Charlie improved during the purge plan. He had initiated a phone call with her, let her drive him to be with a friend, and accepted her offer to buy him fast food. She believed that because Charlie did not have a choice on whether to go to her house, it made it easier for him. Since Charlie got a car in July 2022, she sees him 5 to 10 minutes a week.

Despite the strained relationship Krista has with Charlie and Sophie, she testified that she believed it was in the children's best interests to have equal time with her and Jason. It was her opinion that if the responsibility of choosing to be with her was not removed from the children, her relationship with them would continue to get worse.

### (h) Elliott

The court also held an in camera interview with Elliott, who was 10 years old at the time. Elliott indicated a preference for the visitation schedule in effect during the purge plan where he could spend more time with Jason and less time with Krista. He explained that there is "a lot" of arguing at Krista's house between him and Krista and between Sophie

and Krista and that he "get[s] a lot of stress and headaches like almost every day."

### (i) Testimony Regarding Extended Family

Charlie, Elliott, and Jason all expressed concerns with Krista's parents and stepparents recording them. Krista's father posted a "GoFundMe" page in which he attempted to raise funds to cover Krista's legal costs arising out of the need to end an abusive relationship. Charlie and Sophie both saw the posting. Sophie also complained of Krista's parents interfering with her job at the farmer's market.

### 3. ORDER MODIFYING DECREE

The court entered a 15-page order modifying the decree. It made numerous findings of fact in discussing the testimony and exhibits offered at trial and assessed the witnesses' credibility. It found that both Charlie and Sophie were credible and that their testimony was based on their personal experiences and interactions with Krista and Krista's extended family. It rejected Krista's claim of parental alienation, stating:

> [Krista] went into great detail in attempting to allege parental alienation by trying to argue the children exhibited an absence of guilt about their feelings toward [Krista], the borrowed phrases and scenarios from [Jason], they rejected [Krista's] extended family, and that she had such a positive relationship prior to the divorce that any estrangement at this point was clearly due to the actions or campaign of [Jason], the Court does not agree and does not find evidence to support these arguments. The issue the Court has with these arguments is the children were able to identify specific conduct that [Krista], and her extended family, engaged in that lead them to their feelings of estrangement and desire for a change in parenting time. These were all independent of the interactions between [Krista] and [Jason,] and it is [Krista's]

continued focus of solely blaming [Jason] and failing to acknowledge her own actions/interactions with the minor children that has led to this estrangement.

The court found that a material change in circumstances had occurred that affected the best interests of the children and that the current custody and parenting time was not in the children's best interests. The court awarded Jason sole legal custody of Charlie and Sophie. It retained joint legal custody of Elliott because neither party sought to change it. The court determined that the relationships between Krista and the children had deteriorated to such a level that joint physical custody of Sophie was no longer in her best interests and that Krista's parenting time with all three children should be modified. The court awarded Jason sole physical custody of Charlie and Sophie and awarded the parties joint physical custody of Elliott.

The court modified the parenting plan and then amended it pursuant to Jason's motion to alter and amend. The final parenting plan is as follows:

## CHARLIE

|  | Mon. | Tues. | Wed. | Thurs. | Fri. | Sat. | Sun. |
|---|---|---|---|---|---|---|---|
| Week 1 | Dad | Dad | Dad | Dad | Mom at 3 p.m. | Mom | Mom until 3 p.m. Dad at 3 p.m. |
| Week 2 | Dad | Dad | Dad until 3 p.m. Mom 3 to 8 p.m. Dad at 8 p.m. | Dad | Dad | Dad | Dad |

## SOPHIE

|  | Mon. | Tues. | Wed. | Thurs. | Fri. | Sat. | Sun. |
|---|---|---|---|---|---|---|---|
| Week 1 | Dad | Dad | Dad | Dad until 3 p.m. Mom 3 to 8 p.m. Dad at 8 p.m. | Mom at 3 p.m. | Mom | Mom until 7 p.m. Dad at 7 p.m. |
| Week 2 | Dad | Dad until 3 p.m. | Dad | Dad until 3 p.m. Mom 3 to 8 p.m. Dad at 8 p.m. | Dad | Dad | Dad |

## ELLIOTT

|  | Mon. | Tues. | Wed. | Thurs. | Fri. | Sat. | Sun. |
|---|---|---|---|---|---|---|---|
| Week 1 | Dad | Dad | Dad | Dad until 3 p.m. Mom at 3 p.m. | Mom | Mom | Mom |
| Week 2 | Mom until 3 p.m. Dad at 3 p.m. | Dad | Dad until 3 p.m. Mom at 3 p.m. | Mom | Mom until 9 a.m. Dad at 9 a.m. | Dad | Dad |

The court further ordered that Sophie continue her individual therapy with Burger until he no longer felt it was necessary or until further order of the court. Following a hearing on Jason's motion to alter or amend, it ordered the parties to select a family therapist from a list of five therapists. As to

payment for Sophie's individual therapy, the court ordered Jason to be responsible for the first $250 per year out-of-pocket expenses and the remainder to be divided with Krista's paying 25 percent and Jason paying 75 percent. For family therapy, Krista was to be responsible for 70 percent of the expenses and Jason was responsible for 30 percent.

Although a child support worksheet was prepared that would require Krista to pay child support of $208 per month, the court deviated from this amount. It determined that because Charlie was primarily meeting his own needs and because therapy was being ordered, no child support would be ordered until Elliott was the only minor child. At that time, Jason was required to pay child support of $262 per month. Krista appeals.

## III. ASSIGNMENTS OF ERROR

Krista assigns that the district court abused its discretion by (1) modifying legal and physical custody, parenting time, and parenting plan provisions; (2) awarding Jason sole legal and sole physical custody of the two older children and reducing Krista's parenting time with the youngest child; (3) formulating a parenting plan that ignored the Nebraska Parenting Act and was contrary to the minor children's best interests; (4) considering evidence that predated the entry of the dissolution decree; (5) denying Krista attorney fees and costs; and (6) misapplying the Nebraska Child Support Guidelines.

## IV. STANDARD OF REVIEW

[1] Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed by an appellate court de novo on the record, and will be affirmed absent an abuse of discretion. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021).

[2] Parenting time determinations are also matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination

will normally be affirmed absent an abuse of discretion. *Bornhorst v. Bornhorst*, 28 Neb. App. 182, 941 N.W.2d 769 (2020).

[3] An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*.

## V. ANALYSIS

Krista's first three assigned errors relating to custody and parenting time are all predicated on her argument that the district court erred in finding that Charlie and Sophie were estranged from her, rather than finding that Jason had engaged in parental alienation. Therefore, we address these assignments of error together under the overarching umbrella of parental alienation, but first we set forth the legal framework for a custody modification.

### 1. MODIFICATION OF CUSTODY AND PARENTING TIME

#### (a) Legal Framework

[4,5] Custody of a minor child will not ordinarily be modified absent a material change in circumstances, which shows either that the custodial parent is unfit or that the best interests of the child require such action. *Jaeger v. Jaeger*, 307 Neb. 910, 951 N.W.2d 367 (2020). It is the burden of the party seeking modification to show a material change in circumstances. *Id*. Specifically, the movant must show two elements: First, that since entry of the most recent custody order, there has been a material change in circumstances that affects the child's best interests, and second, that it would be in the child's best interests to change custody. *Id*.

[6-8] A material change in circumstances is the occurrence of something that, if it had been known at the time the most recent custody order was entered, would have persuaded that court to decree differently. *Id*. Circumstances having occurred

before the most recent custody order are relevant only insofar as they bear on whether the change in circumstances since the most recent custody order are material and substantial. *Id*. Before custody is modified, it should be apparent that any material change in circumstances alleged will be permanent or continuous, not merely transitory or temporary. *Id*.

[9] In determining whether there has been a material change in circumstances, "'if a child is of sufficient age and has expressed an intelligent preference, the child's preference is entitled to consideration,' alongside other factors." *Jaeger v. Jaeger*, 307 Neb. at 920, 951 N.W.2d at 376, quoting *Leners v. Leners*, 302 Neb. 904, 925 N.W.2d 704 (2019), *disapproved on other grounds, State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). The amount of consideration will depend on the child's age and ability to give reasons for his or her preference. *Jaeger v. Jaeger, supra*. Where a trial court's order demonstrates that the child's age and reasoning have been duly considered alongside the child's stated preference, we will generally defer to the trial court's credibility determinations in our assessment of facts. *Id*.

Consideration of the child's best interests involves a combination of both mandatory and permissive factors. *Id*. Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) requires that certain factors must be considered, including (1) the relationship of the child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health, welfare, and social behavior of the child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. *Jaeger v. Jaeger, supra*.

Other relevant considerations that may also be considered include the stability of the child's existing routine, minimization of contact and conflict between the parents, and the general nature and health of the child. *Id*. No one factor is

dispositive, and various factors may weigh more or less heavily, depending on the case. *Id*.

### (b) Rejection of Krista's
### Parental Alienation Claim

[10] Krista assigns that the district court abused its discretion in awarding Jason sole legal custody of Charlie and Sophie and sole physical custody of Sophie and in reducing her parenting time with Elliott. (Per the parties' prior stipulation, Jason had been awarded primary physical custody of Charlie in the decree.) Krista argues that Charlie and Sophie testified untruthfully and that in accepting their testimony, the district court "ignored a massive record of parental alienation." Brief for appellant at 26. She also argues that the "court should have placed more emphasis on the testimony of Dr. Cottam." *Id*. However, witness credibility and the weight to be given to testimony is within the province of the trial court. An appellate court will consider the fact that the trial court saw and heard the witnesses and observed their demeanor while testifying, and will give great weight to the trial court's judgment as to credibility. *Knapp v. Knapp*, 32 Neb. App. 669, 4 N.W.3d 415 (2024).

We recognize that Sophie testified to events that were not only inconsistent with Krista's testimony, but also were disproved by documentary evidence. For example, in criticizing her mother's homeschooling of her, Sophie claimed that she had never written a paragraph prior to being enrolled in public school; however, Krista testified that Sophie had taken at least five writing classes and produced an invoice for one of those classes and two essays that Sophie had written while being homeschooled. Likewise, Sophie's description of Krista's presence at Sophie's first day of school was contrary to the video of that same event. However, the district court acknowledged it did not look at isolated events, but, rather, the totality of the circumstances, in its determination that parental alienation had not occurred.

Two of Sophie's reasons for her disdain for Krista were Krista's dishonesty and lack of respect for Sophie's privacy. Krista claims Sophie feels this way because Jason has projected his feelings about her onto Sophie, but there was evidence of specific instances on which Sophie based her feelings. Sophie described in her affidavit that Krista promised not to attend her dance rehearsal, but she sat in the auditorium and took pictures. Sophie described another incident where she saw an active recording application on Krista's phone; Krista initially denied recording the children but then admitted that she had. In the affidavit, Sophie also described instances in which Krista read Sophie's text messages on her phone, went through Sophie's bag, and removed Sophie's bedroom door. Although Sophie's reaction to these events may or may not be typical for a 14-year-old girl, we identify them simply to point out that there were specific incidents Sophie described to support her lack of distrust that did not involve Jason.

Krista argues that Charlie was unable to articulate anything specific that had occurred between him and Krista in the last 2 years, but the evidence reveals Charlie has had minimal interaction with Krista over that time period. His one specific complaint was that Krista does not listen to him. To support that, he discussed having told Krista that he does not like Krista's mother, yet the weekend before the hearing, Krista invited her mother to stay at Krista's apartment when it was Charlie's weekend to stay there. Charlie also testified that he had requested Krista not to ask him, in front of Elliott, to participate in activities with Elliott, but just the week before the hearing, she asked Charlie to watch a movie with her and Elliott. Krista did not deny asking Charlie, in front of Elliott, to participate in activities, but she tried to explain it in a broader context. Charlie perceived these as examples of Krista's not listening to him and his perception is not irrational.

Similarly, the district court discussed both Cottam's and Batter's testimony in its order, particularly as it related to the

distinction between parental alienation and estrangement. It found that the reasons Charlie and Sophie gave for rejecting Krista were not "'unjustified'" or "'irrational.'" It also discussed many of the factors indicative of parental alienation, including parroting, an absence of guilt, rejection of extended family, and borrowed phrases, and found that the children's actions and attitudes were based on specific conduct that Krista and her extended family engaged in and were not a result of any influence by Jason.

While there was much evidence at the contempt hearing of Jason's actions that interfered with Krista's parenting time, once Jason was held in contempt and the purge order was entered, subsequent hearings do not reflect any overt actions of Jason to support a finding of interference or alienation. That left the district court to infer that Charlie's and Sophie's rejection of Krista was due to acts of Jason, and it rejected that proposition. We do not interpret that as a disregard of the evidence. To the contrary, the order of contempt makes clear that the court was able to distinguish between alienation and estrangement.

During the contempt proceedings, the district court recognized that Jason engaged in activities that contributed to the children's treatment of Krista but also recognized Krista's role in the demise of her relationship with the children. In its order finding Jason in contempt, it stated:

> [Jason's] actions attempted to exculpate any responsibility for the deterioration of [Krista's] relationship with her children. When in reality, it was [Jason's] actions which directly impacted, fostered and nurtured the continued deterioration of [Krista's] relationship. The Court noted that [Krista] is not wholly innocent in the issues that have arisen between [Krista] and the children, but the Court finds that [Jason's] continued actions have dramatically impacted the issues and allowed them to grow and foster unabated.

The district court recognized that despite Jason's recent compliance with the purge plan, Krista and Sophie's relationship continued to suffer. It found that "this is not the result of any actions by [Jason] or as a result [of] his failure to comply with the contempt purge/sentencing order." Consequently, it allowed the modification hearing to proceed.

As reflected by the district court's order modifying the decree, it did not find Krista's evidence at the modification hearing persuasive that Jason engaged in further actions to undermine the children's relationship with Krista; rather, it maintained its belief that it was Krista's interactions with the children that led to the issues. Contrary to Krista's argument that the district court "ignored a massive record of parental alienation," brief for appellant at 26, it did not ignore it; instead, it found the evidence Krista presented did not support her argument.

As quoted above, the district court rejected Krista's argument that the children were exhibiting behaviors reflective of parental alienation and instead found that the children were able to identify specific conduct that Krista, and her extended family, engaged in that led them to their feelings of estrangement and desire for a change in parenting time. It found it was Krista's continued focus of solely blaming Jason and failing to acknowledge her own actions/interactions with the minor children that led to the estrangement. We find no abuse of discretion in the district court's conclusion.

Our conclusion is reinforced by Jason's testimony that once the purge order was entered, he changed his behavior. Not only did he no longer "rescue" the children from Krista's house, but he addressed Charlie's disrespectful communication with Krista and encouraged Sophie to continue with Cottam despite her desire to terminate therapy. Both children confirmed this in their testimony. Although Charlie and Sophie may exhibit some of the behaviors indicative of parental alienation, the basis for their attitude toward Krista must be irrational to rule out estrangement. Because there was evidence of specific

incidents to which the children could point to support their feelings and because the record does not reveal that Jason continued to engage in alienating conduct following the purge order, we agree with the district court's determination.

Having found no abuse of discretion in the district court's rejection of Krista's claim of parental alienation, we turn to an analysis of whether a material change in circumstances occurred and whether it was in the children's best interests to modify custody and the parenting plan.

(c) Material Change in Circumstances

Prior to the divorce decree being entered, the parties agreed upon a parenting plan that addressed both legal and physical custody, which plan was incorporated into the decree. Since that time, Krista's relationship with Charlie and Sophie has deteriorated to the point that it is virtually nonexistent. All three children expressed an interest in spending less time with Krista or, conversely, more time with Jason. All three of them described their time with Krista as "stressful," including 10-year-old Elliott who complained of headaches nearly every day he was with her. The situation has become progressively worse and does not appear transient or temporary.

The record is also clear that Jason and Krista cannot communicate effectively to make decisions regarding Charlie and Sophie. Krista testified that the communication between them was not good enough to share joint legal custody. Had the district court been aware that these family dynamics would arise, surely it would not have awarded custody as it did. Therefore, we agree that a material change in circumstances occurred since the entering of the decree. See, *Jaeger v. Jaeger*, 307 Neb. 910, 951 N.W.2d 367 (2020); *State on behalf of Slingsby v. Slingsby*, 25 Neb. App. 239, 903 N.W.2d 491 (2017) (addressing consideration of child's preference and relationship with custodial parent in determining material change of circumstances for modifying custody). See, also, *Schroeder v. Schroeder*, 26 Neb. App. 227, 918 N.W.2d 323

(2018) (affirming finding of material change of circumstances where parties could not agree on issues involving child).

### (d) Children's Best Interests

To determine whether a change in custody is in a child's best interests, § 43-2923(6) requires consideration of several factors, including (1) the relationship of the child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health, welfare, and social behavior of the child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse.

Prior to commencement of the modification hearing, Krista's relationship with Charlie and Sophie had already begun to deteriorate as evidenced by her application for contempt. Although the district court held Jason in contempt and found him partly responsible for the deteriorated relationships, it did not completely exonerate Krista. Therefore, as to the first factor, a change in custody is in the best interests of Charlie and Sophie.

As to the second factor, both Charlie and Sophie expressed a desire for a change in custody, and each are sufficiently mature to have their voices heard. In addition to their express wishes, we also find support for a change in custody based upon the environment that Jason has established. Aside from a less stressful household, the evidence supports that Jason has a good rapport with the children. When Charlie's grades declined, Jason conversed with him about the importance of school and expressed an understanding of Charlie's extracurricular desires but imparted the importance of balancing school and a social life. As a result, Charlie's grades have improved, and he has been able to prioritize his activities. Likewise, Sophie appears to have an open dialogue with Jason as evidenced by Jason's testimony that she expressed to him her desire to engage in individual therapy with Burger and to

end family therapy with Cottam. Instead of affirming Sophie's desire regarding family therapy, Jason advised her to find something positive about the sessions.

As children mature into adults, it is imperative that they have parental guidance, and while it would be ideal for that guidance to come from both parents, in a situation such as here, the general health, welfare, and social behavior of the children is best served by awarding Jason custody. Based on the evidence, Jason attends to Sophie's mental health needs and has addressed with both Charlie and Sophie appropriate social behavior. Being forced into an environment where both children isolate themselves in their rooms is not conducive to their general health, welfare, or social behavior.

Krista has asserted that parental alienation is a form of child abuse, but because we affirm the district court's determination that Jason did not alienate the children, considerations of abuse are unnecessary. Having considered the required factors, we find no abuse of discretion in the district court's award of legal and physical custody to Jason.

(e) Parenting Time

Krista also assigns the district court abused its discretion in modifying her parenting time with Elliott. Under the divorce decree, Krista had parenting time with Elliott on a "3-2-2" schedule. During week 1, Elliott was with Krista from 3 p.m. on Monday until 3 p.m. on Wednesday. He returned on Friday at 3 p.m. until Monday at 3 p.m. During week 2, Elliott was with Krista from 3 p.m. on Wednesday until 3 p.m. on Friday and returned to Krista at 3 p.m. the following Monday. Sophie's schedule was the same. Under the modified schedule, during week 1, Elliott is with Krista from 3 p.m. on Wednesday until 3 p.m. on Monday. During week 2, he is with her from 3 p.m. on Wednesday until 9 a.m. on Friday.

[11] In Elliott's in camera interview with the district court, he expressed a desire to spend more time with Jason and indicated a preference for the parenting plan that existed as

part of the purge order; it, in part, eliminated some of the "back and forth" between the two parents. In formulating Elliott's time with each parent, the district court explained that it crafted a plan to give Elliott "an opportunity to spend time at his mother's home with his brother and sister at times and with his mother alone at times, and to have set and certain days each week where he will be at both his mother and father's residence without an alternating schedule." In formulating a parenting plan, the best interests of the children are the primary and paramount considerations. See *Winkler v. Winkler*, 31 Neb. App. 162, 978 N.W.2d 346 (2022). We find that modification of the parenting plan was in Elliott's best interests.

Although Elliott was only 10 years old at the time of the modification hearing, he expressed the angst he experienced at Krista's apartment due to the relationship between her and his siblings. He was articulate in his reasons for wanting to spend more time with Jason. The Nebraska Supreme Court has given a child's preference significant consideration typically when the child is over 10 years old. See, *Jaeger v. Jaeger*, 307 Neb. 910, 951 N.W.2d 367 (2020); *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002). Given Elliott's age and his articulated reason for a change in the parenting plan, as well as the district court's intent to create a parenting plan to accommodate each child's time with both parents and with each other, we find no abuse of discretion in the modified parenting plan.

### (f) Parenting Time With Extended Family

In its parenting plan, the district court ordered the parties to support the minor children's relationships with both sets of grandparents and extended family with the exception of Krista's father and his wife. As to them, the district court precluded Krista from inviting them to any of the children's extracurricular activities and forbade them from attending the children's events and from transporting the children. Krista

argues this was an abuse of discretion. We find no abuse of discretion in restricting Krista from inviting her father and his wife to the children's events; however, we find the court abused its discretion in preventing them from attending any of the children's events, as explained below.

After Krista filed for divorce, her father started a "GoFundMe" page to raise money for legal fees, in which he asserted that Krista was a victim of financial, emotional, mental, and physical abuse. Charlie and Sophie discovered it and brought it to Jason. Additionally, Charlie testified to an incident in which he believed Krista's father was following him, and Jason relayed an event, during which Charlie was present, when Krista's father threatened to "put [him] in the hospital." The record contains additional events of Krista's father and stepmother exhibiting their animosity toward Jason in the presence of the children and episodes of them recording, or appearing to record, him and the children. Jason requested the provision to exclude them so the children could enjoy their activities without worrying about a confrontation with Krista's father and stepmother.

[12] At a posttrial hearing, the district court explained that the reason it excluded these grandparents from attending activities is because it disrupted the children's lives and the court was focused on the core family of father, mother, and children. According to the district court, all of the children expressed discomfort with these grandparents, and it was trying to avoid additional issues. We find no abuse of discretion in the district court's reasoning or in ordering Krista not to invite them to the children's events or allow them to transport the children. However, because Krista's father and his wife were not parties to the modification proceeding, the court lacked jurisdiction over them, and it had no authority to restrict their independent decision to attend the children's events. See *Seemann v. Seeman*, 316 Neb. 671, 6 N.W.3d 502 (2024) (district court lacked authority over entities that were not parties to case). We therefore strike that portion of

paragraph 8 of the parenting plan, which reads "and they may not attend any extracurricular activities or school events of the minor children." We affirm the remainder of paragraph 8.

We are mindful of Krista's concern that awarding her less time with the children will lead to further emotional distance among them; however, we share the district court's hope that through both individual and family therapy these relationships will mend. Although at the time of trial, family therapy had been unsuccessful, this appears to be in part because Krista unilaterally chose the therapist. Conceivably, the district court's collaborative approach of selecting a new therapist will provide Krista and Sophie a more balanced therapeutic experience.

## 2. Evidence That Predated Entry of Divorce Decree

Krista assigns that the district court abused its discretion in considering evidence that predated entry of the decree of dissolution. Because Krista does not point us to any specific evidence to which she objected at trial, we read her assigned error as attacking not the admissibility of evidence, but, rather, the weight given it by the district court. We find no abuse of discretion.

To find a material change in circumstances, the party moving for modification must show a change that has occurred "after the entry of the previous custody order." *Weaver v. Weaver*, 308 Neb. 373, 387, 954 N.W.2d 619, 630 (2021). We agree that both parties presented evidence that predated and postdated the entry of the divorce decree, but the evidence was relevant to show the continuum of the children's relationship with Krista. For example, the precipitating event for Charlie was witnessing his parents' disagreement in September 2019, before Krista even filed for divorce. His perception of this event along with the 5-week separation between Krista, Sophie, and Elliott on one hand, and Charlie and Jason on the other, greatly affected him. And although Charlie testified

about events that occurred prior to the entry of the divorce decree, he also identified at least two events that occurred the week prior to trial in support of his assertion that Krista did not listen to him.

Krista iterates her credibility arguments regarding Sophie's testimony, and we rejected those arguments above. See *Knapp v. Knapp*, 32 Neb. App. 669, 4 N.W.3d 415 (2024) (great weight given to trial court's credibility determinations). We find no abuse of discretion by the district court in relying upon the evidence presented to reach its conclusion.

### 3. Application of Nebraska Child Support Guidelines

The district court deviated from the Nebraska Child Support Guidelines in its child support determination. Rather than order Krista to pay child support of $208 a month as calculated under the guidelines, it ordered that she pay a portion of Sophie's therapy expenses. Specifically, it ordered:

> As to individual mental health counseling for Sophie, [Jason] shall be responsible for the first $250.00 per year for out of pocket expenses associated with the individual therapy for Sophie. After the first $250.00 is paid by [Jason], the parties shall split the expenses for individual therapy for Sophie with [Krista's] paying 25% and [Jason's] paying 75%.

> As to family therapy for Sophie, Elliott and [Krista], [Krista] shall be responsible for 70% and [Jason] responsible for 30% for the costs associated with that family therapy. This breakdown reflects the deviation in child support relieving [Krista] of the child support obligation for 3 minor children due to the advanced age and independence of the oldest child and for those funds to be utilized by [Krista] to pay for family therapy to rehabilitate her relationship with the other minor children.

Krista assigns that the district court abused its discretion "in applying the Nebraska Child Support Guidelines." She argues:

> The Court appears to have attempted to give Krista a break on child support, but in doing so, the court abused its discretion. In lieu of ordering Krista to pay $208 per month in child support, the court instructed her to pay $0 but to pay the $208 toward therapy.

Brief for appellant at 39. We disagree with Krista's reading of the order on the motion to alter or amend.

The order does not require Krista to pay $208 toward therapy; rather, it requires her to pay 70 percent of family therapy for herself, Sophie, and Elliott. At the hearing on the motion to alter or amend, the district court explained that because both parties were responsible for the children needing therapy, it was trying to devise an equitable way to pay for that therapy. Krista's attorney proposed that Krista pay 25 percent and Jason pay 75 percent. The court rejected those percentages, and it instead ordered Krista to pay 70 percent and Jason to pay 30 percent but deviated from ordering child support to help offset the cost for Krista.

[13] The child support worksheets indicate a "*Pearrow* Calculation," reflecting a hybrid approach for child support calculations when neither a sole custody approach nor a joint custody approach is appropriate. See *Pearrow v. Pearrow*, 27 Neb. App. 209, 928 N.W.2d 430 (2019). In *Pearrow*, we affirmed the use of such a calculation, recognizing that although child support should generally be set by the guidelines, the guidelines offer flexibility and guidance, while understanding that not every child support scenario will fit neatly into a calculation structure. See *Gress v. Gress*, 271 Neb. 122, 710 N.W.2d 318 (2006).

Here, the court ordered family therapy to repair the relationship between Krista and Sophie and Elliott. The evidence supports the district court's finding that although it is Krista's relationship with the children that needs mending, Jason is not without some blame. Therefore, we find no abuse of discretion in the district court's order requiring Krista to pay 70 percent of the family therapy costs. An abuse of discretion

occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Windham v. Kroll*, 307 Neb. 947, 951 N.W.2d 744 (2020).

Krista also argues that the court ordered her to pay a portion of expenses under Neb. Ct. R. § 4-212 (rev. 2011), even for Charlie and Sophie for whom she does not have joint physical custody. We note no reference to § 4-212 in either the modification order or the order on motion to alter or amend. Aside from the therapy ordered for Sophie, our review of the orders reflects only an order for payment of 25 percent of extracurricular activities for Charlie and Sophie, and we find no abuse of discretion in this regard.

Neb. Rev. Stat. § 42-364.17 (Reissue 2016) requires that a dissolution decree include "each party's responsibility for reasonable and necessary medical, dental, and eye care, medical reimbursements, day care, extracurricular activity, education, and other extraordinary expenses of the child." Consequently, to the extent Krista argues that the district court abused its discretion in requiring her to pay 25 percent of Charlie's or Sophie's extracurricular expenses, we reject this argument.

### 4. Denial of Attorney Fees and Costs

Krista assigns the district court erred in denying her attorney fees and costs and requests that we reverse the modification order and order attorney fees on remand. Having found no abuse of discretion by the district court, however, we determine Krista is not entitled to attorney fees. This assigned error fails.

## VI. CONCLUSION

For the reasons stated above, we affirm as modified the district court's order modifying custody and Krista's parenting time.

Affirmed as modified.